Argued and submitted October 27, 2009, affirmed May 19, 2010

In the Matter of
the Suspension of the Driving Privileges of

EDWARD ALLEN SIVIK,
*Petitioner-Appellant,*

*v.*

DRIVER AND MOTOR VEHICLE
SERVICES DIVISION (DMV),
a Division of the Department of Transportation,
*Respondent-Respondent.*

Douglas County Circuit Court
07CV4753CC; A138782

231 P3d 1177

George W. Kelly argued the cause and filed the brief for appellant.

Samuel A. Kubernick, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Erika L. Hadlock, Acting Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

### SCHUMAN, J.

The Driver and Motor Vehicle Services Division (DMV) ordered the suspension of petitioner's driver's license for driving under the influence of intoxicants (DUII), and, on judicial review, the circuit court affirmed the suspension. On appeal, petitioner contends that the suspension is invalid because the administrative law judge (ALJ) and circuit court erred in denying petitioner's motion to suppress evidence obtained after an officer detained defendant without reasonable suspicion of criminal activity. We review the DMV order directly for substantial evidence and errors of law, ORS 813.450(4); *Davis v. DMV*, 209 Or App 39, 41, 146 P3d 378 (2006), *rev den*, 342 Or 344 (2007), and we affirm.

The facts are undisputed. At around 2:20 a.m., Officer Mills was in a parking lot in Sutherlin, observing traffic. Mills saw petitioner drive into the lot at a speed that kicked up gravel and then pull into the driveway of a closed coffee kiosk. As Mills observed petitioner, he saw him turn off his headlights and then "slump" behind the steering wheel. At that point, Mills became concerned that petitioner was in need of assistance and drove over to petitioner's van. Before reaching it, he saw petitioner "jump" into the back seat. Mills parked his patrol car behind the van and noticed that its engine was off and the driver-side window was down. Mills called out to petitioner, but received no response. Shining his patrol car's spotlight into the van, Mills was able to see petitioner lying immobile on the back seat. Mills knocked on the window but petitioner did not immediately respond. When he finally did, Mills detected the strong odor of alcohol emanating from inside the van, and he noticed signs that petitioner was intoxicated: petitioner's eyes were bloodshot and watery, and his speech was slurred and incoherent. At that point, Mills believed that petitioner had driven while intoxicated, although that belief had not yet ripened into probable cause. Petitioner told Mills that he was fine and had been sleeping. Petitioner admitted to having had one beer at home, but denied having had any more drinks.

Because it was dark and the van had tinted windows, Mills became concerned for his own safety and asked petitioner to step out of the van. When he did, Mills saw that

petitioner was swaying side-to-side and could not keep his balance. At that point, Mills developed the belief that, more likely than not, petitioner had been driving under the influence of alcohol. He asked petitioner to take field sobriety tests. Petitioner refused. Mills arrested him for driving under the influence of intoxicants. Later, after petitioner was taken into custody, he refused to take a breath test.

DMV suspended petitioner's driving privileges, and petitioner requested an administrative hearing to contest the suspension. ORS 813.410. At the hearing, petitioner argued that any perception of an emergency that had arisen when petitioner slumped over his steering wheel was negated when he jumped into the back of the van, and, therefore, the officer should not have approached the van in the first place. In the alternative, petitioner argued that, once the officer knew there was no longer an emergency, he should have left, and anything found after that point was inadmissible. DMV responded that the stop was justified under the community caretaking statute, ORS 133.033. The ALJ agreed with DMV and concluded:

> "The officer's testimony was credible and uncontroverted. The fact that the officer also saw the driver turn off the vehicle's headlights and engine and then get into the backseat did not necessarily negate his community caretaking responsibility. For all the officer knew, the driver could have been ill or disoriented and was moving to the backseat in order to lie down or harm himself. In fact, the officer's concern was arguably heightened when he called out to the driver and knocked on the vehicle and did not receive an immediate response. Based on the totality of the circumstances, the officer's initial contact with petitioner, to check on his welfare, was for a valid 'community caretaking' purpose and did not require legal justification as a stop."

ORS 133.033, the statute on which the ALJ relied, provides, in part:

> "(1)   Except as otherwise expressly prohibited by law, any peace officer of this state * * * is authorized to perform community caretaking functions.

> "(2)   As used in this section, 'community caretaking functions' means any lawful acts that are inherent in the duty of the peace officer to serve and protect the public.

'Community caretaking functions' includes, but is not limited to:

"(a)   The right to enter or remain upon the premises of another if it reasonably appears to be necessary to:

"* * * * *

"(B)   Render aid to injured or ill persons[.]

"* * * * *

"(b)   The right to stop or redirect traffic or aid motorists or other persons when such action reasonably appears to be necessary to:

"* * * * *

"(B)   Render aid to injured or ill person[s]."

Petitioner sought judicial review in the circuit court, and the circuit court affirmed.

Before this court, petitioner renews one of the arguments that he made at the administrative hearing. He argues that it was not objectively reasonable for Mills to think that there was a true emergency situation, and, therefore, the community caretaking exception did not apply. The state responds that Mills was justified in exercising his community caretaking functions.

■■■   Our review requires us at the outset to clarify once again the relationship between the community caretaking statute, ORS 133.033, and Article I, section 9, of the Oregon Constitution—as the Supreme Court did in *State v. Dahl*, 323 Or 199, 205, 915 P2d 979 (1996), and we did in *State v. Goodall*, 219 Or App 325, 334, 183 P3d 199 (2008), and *State v. Martin*, 222 Or App 138, 144-46, 193 P3d 993 (2008), *rev den*, 345 Or 690 (2009). A warrantless search or seizure must be justified by an exception to the warrant requirement. *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991). The community caretaking statute is not an exception to the warrant requirement. *Martin*, 222 Or App at 146. It is the statutory expression of the well-settled precept that the actions of law enforcement officers, like all other government actors' actions, must be traceable to some grant of authority from a politically accountable body. *State v. Bridewell*, 306 Or 231,

239, 759 P2d 1054 (1988). ORS 133.033 is such a grant of authority. Compliance with the statute is a necessary *but not sufficient* element of lawful police activity of the sort that the statute specifies. However, as the statute itself expressly states, the action must also be one that is not "otherwise expressly prohibited by law"; it must be a "lawful act[ ]." ORS 133.033(1), (2). "Whatever the meaning of 'lawful acts' in the context of ORS 133.033, that meaning must be consonant with the state and federal constitutions." *Dahl*, 323 Or at 205. Thus, a "community caretaking" search or seizure (as distinct from a search or seizure for purposes of law enforcement) must fall within the ambit of ORS 133.033 and it must also meet constitutional standards. The statute provides the predicate grant of authority, and the constitution specifies limitations on that grant. *Martin*, 222 Or App at 145-46.[1]

■      At the administrative hearing and before this court, defendant challenges only his detention; he does not present any argument regarding an allegedly unlawful search. The relevant portion of ORS 133.033 authorizes stops to "aid motorists or other persons when such action reasonably appears to be necessary to * * * [r]ender aid to injured or ill persons[.]" ORS 133.033(2)(b)(B). We conclude without difficulty that Mills's perception that petitioner was "injured or ill" was reasonable. The officer observed petitioner speed into a parking lot at 2:20 a.m. and slump against the steering wheel of his van. The fact that petitioner then "jumped" into the back seat and lay down there did not, as petitioner contends, remove any reasonable belief that petitioner was ill and in need of aid, particularly in light of the fact that Mills had a difficult time rousing him.

■      With respect to Article I, section 9, and the limitations that that provision imposes on even statutorily authorized actions, the parties (as well as the ALJ and the circuit court) focus exclusively on the "emergency aid" exception to the warrant requirement. The exception has four elements:

---

[1] In *State v. Wood*, 210 Or App 126, 149 P3d 1265 (2006), we noted that the defendant had argued that ORS 133.033 did not create an independent exception to the warrant requirement. We did not address that argument. Instead, we noted that ORS 133.033 and the "emergency aid" exception to Article I, section 9, were "analogous," and we upheld the police action on that basis.

"(1) The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.

"(2) The emergency must be a true emergency—the officer's good faith belief alone is insufficient.

"(3) The search must not be primarily motivated by an intent to arrest or to seize evidence.

"(4) The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

*State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993). Because the only disputed police action in this case was not a search but a seizure, however, the "emergency aid" exception as described in *Follett* is simply not relevant; by its terms, it is an exception that can justify warrantless *searches*. We have never held that it can justify warrantless *stops*, and we need not decide that question in the present case. That is because the stop in the present case was lawful in any event. *See Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659-60, 20 P3d 180 (2001) (appellate court can affirm on alternative basis if facts in the record support the alternative basis, the trial court ruling below is consistent with the view of the evidence under the alternative basis for affirmance, and the record is materially the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below). Here, the fully developed record contains undisputed facts establishing that, by the time the interaction between Mills and petitioner became a constitutionally significant seizure, Mills had reasonable suspicion that petitioner had driven while intoxicated.

A seizure for purposes of Article I, section 9, occurs when a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives a person of his or her freedom of movement or where a person believes that his or her freedom of movement has been so restricted and that belief is objectively reasonable. *Holmes,*

311 Or at 409-10. It is frequently a daunting task to determine when, exactly, a constitutionally insignificant encounter, "mere conversation," becomes a seizure triggering constitutional protections. *See, e.g., State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008), *rev allowed*, 346 Or 257 (2009). Here, however, it is clear that, when Mills awakened petitioner and asked him if he was in distress, the encounter was mere conversation by anybody's standard. Mills did not interfere with petitioner's freedom of movement until he asked petitioner to step out of his van. By that time, he had developed a suspicion that petitioner had been driving while intoxicated, and that suspicion was reasonable; he had observed petitioner drive into the lot with the wheels of his van kicking up gravel, pull to a halt in front of a closed coffee kiosk, and slump over the steering wheel. Before actually conversing with petitioner, Mill had detected a strong odor of alcohol emanating from the van. Although he testified that he did not develop probable cause to believe that petitioner had been driving while intoxicated until after petitioner stepped out of the van, he also testified that he had developed a suspicion before making contact. The stop was lawful, and the ALJ did not err in rejecting petitioner's argument to the contrary.

Affirmed.